LONG, Appellee,

v.

LONG, Appellant.

[Cite as *Long v. Long,* 176 Ohio App.3d 621, 2008-Ohio-3006.]

Court of Appeals of Ohio,
Second District, Greene County.

No. 07–CA–54.

Decided June 20, 2008.

---

10.  See App.R. 12(A)(1)(c).

Dean E. Hines, for appellee.

Michael R. Eckhart, for appellant.

---

BROGAN, Judge.

{¶ 1} Linda C. Long appeals from a final judgment entry and decree of divorce issued by the Greene County Common Pleas Court, Domestic Relations Division. In its judgment entry, the trial court terminated Linda's marriage to plaintiff-appellee, Jeffrey D. Long, and resolved a number of issues, including spousal support, child support, and the division of marital assets, which included Linda's pension.[1]

{¶ 2} Linda advances four assignments of error on appeal. First, she contends that the trial court erred in awarding Jeffrey spousal support. Second, she claims that the trial court erred in not awarding her one-half of a personal-injury settlement Jeffrey received during the marriage. Third, she contends that the trial court erred in not awarding her the tax exemption for both of the parties' minor children. Fourth, she argues that the trial court erred in "setting a

---

1. For purposes of clarity, we will refer to the parties by their first names.

coverture factor" on her retirement benefits and in awarding Jeffrey survivor benefits.

{¶ 3} The record reflects that the parties were married in June 1983. They separated in April 2005, the same month that Jeffrey filed his complaint for divorce. At the time of their separation, the parties had two minor children, a 15–year–old son and a 12–year–old daughter. The divorce action proceeded to a two-day hearing on January 9, 2006, and May 9, 2006. Based on the evidence presented, the trial court filed a final judgment entry and decree of divorce on May 24, 2007.

{¶ 4} The trial court designated Linda the residential parent for the parties' two minor children. After considering the applicable statutory factors, it awarded Jeffrey spousal support of $7,600.09 per year. The trial court set the duration of the award at ten years. It did not require any actual payment of spousal support, however, because it found Jeffrey obligated to pay Linda an equal amount of child support. After offsetting these obligations, the trial court ordered "no current payments of child support or spousal support payable by either party subject to further orders of the Court." The trial court then retained jurisdiction over the amount of spousal support and provided that "[e]ither party may file a motion in the future should the child support terminate or the obligation to pay child support terminates."

{¶ 5} With respect to the division of assets, the trial court noted that the parties already had sold the marital residence. It ordered an equal division of the equity in that property. The trial court also ordered the sale of a second piece of marital real estate, a home located at 4564 Hastings Drive in Kettering, Ohio. The trial court found Jeffrey entitled to the first $48,500 in equity from the sale of this real estate. In reaching this conclusion, the trial court noted that Jeffrey had used his own nonmarital property, namely $48,500 from a personal-injury settlement, to pay down the mortgage during the marriage.

{¶ 6} On the issue of tax exemptions for the parties' minor children, the trial court stated:

{¶ 7} "Plaintiff shall be entitled to the state, federal, and local tax dependency exemptions for the parties' minor child, Daniel, with Defendant being entitled to said exemptions for the parties' minor child, Stephanie. When Daniel is emancipated, the parties shall alternate taking the yearly tax dependency exemptions for the children with Plaintiff being entitled to the exemption in even numbered years."

{¶ 8} Finally, with regard to the division of retirement accounts, the trial court stated:

{¶ 9} "Plaintiff has no retirement benefits other than expected Social Security payments. Defendant is the vested owner of retirement benefits with the Federal Thrift Savings Plan (TSP) and Federal Employees Retirement System (FERS). Due to the nature of Defendant's retirement benefits with FERS, she is not eligible to receive Social Security benefits. Plaintiff shall be entitled to fifty (50%) of the marital portion of Defendant's retirement benefits held with the TSP. A court order acceptable for processing shall issue effectively dividing said benefits and naming Plaintiff as survivor on his portion of same. The marital portion of all retirement benefits detailed herein shall be from the date of the parties' marriage (June 11, 1983) until the parties' separation on April 28, 2005 which shall be the de facto date of termination of the marriage. Plaintiff shall be entitled to fifty [percent] (50%) of the marital portion of Defendant's retirement benefits held with FERS after an offset against said marital portion for fifty percent (50%) of the marital portion of Plaintiff's Social Security benefits as detailed pursuant to the *Neville* valuation previously filed herein. Present value calculations concerning Plaintiff's Social Security benefits and Defendant's CSRS [sic] benefits have been prepared by Pension Evaluators who shall utilize same in preparing an order for submission to FERS to effectively divide Defendant's retirement benefits. Plaintiff shall also be named survivor on his portion of Defendant's FERS benefits after the aforementioned offset to take into account Defendant's marital interest in Plaintiff's Social Security benefits."

{¶ 10} In her first assignment of error, Linda challenges the trial court's award of spousal support. She advances three arguments. First, she argues that no spousal support should have been awarded. Second, she asserts that the ten-year duration of the award is excessive. Third, she contends that the trial court expressly should have provided for spousal support to terminate if Jeffrey remarries.

{¶ 11} Upon review, we reject Linda's argument that the trial court erred in awarding Jeffrey any spousal support at all. "Domestic relations courts are granted broad discretion concerning awards of spousal support, and their orders will not be disturbed on appeal absent an abuse of discretion." *Perry v. Perry*, Clark App. No. 07–CA–11, 2008-Ohio-1315, 2008 WL 748370, ¶ 5. "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140. When applying the abuse of discretion standard, we may not substitute our judgment for that of the trial court. *In re Jane Doe 1* (1991), 57 Ohio St.3d 135, 138, 566 N.E.2d 1181.

{¶ 12} The awarding of spousal support is governed by R.C. 3105.18(C)(1), which provides:

{¶ 13} "In determining whether spousal support is appropriate and reasonable, and in determining the nature, amount, and terms of payment, and duration of spousal support, which is payable either in gross or in installments, the court shall consider all of the following factors:

{¶ 14} "(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;

{¶ 15} "(b) The relative earning abilities of the parties;

{¶ 16} "(c) The ages and the physical, mental, and emotional conditions of the parties;

{¶ 17} "(d) The retirement benefits of the parties;

{¶ 18} "(e) The duration of the marriage;

{¶ 19} "(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;

{¶ 20} "(g) The standard of living of the parties established during the marriage;

{¶ 21} "(h) The relative extent of education of the parties;

{¶ 22} "(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;

{¶ 23} "(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;

{¶ 24} "(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;

{¶ 25} "(l) The tax consequences, for each party, of an award of spousal support;

{¶ 26} "(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

{¶ 27} "(n) Any other factor that the court expressly finds to be relevant and equitable."

{¶ 28} When reviewing an award of spousal support, we examine the record to determine whether the court considered each statutory factor which is relevant to the request, although the trial court need not have expressly

commented or made a finding with respect to each such factor. *Kreilick v. Kreilick,* 161 Ohio App.3d 682, 2005-Ohio-3041, 831 N.E.2d 1046, at ¶ 24. In the present case, however, the trial court did expressly address the factors and made findings on nearly all of them.

{¶ 29} In particular, the trial court stated:

{¶ 30} "Pursuant to 3105.18(C), the Court has considered the parties' income from all sources and find[s] that the Plaintiff's average gross income from business is $40,600.00 per year. After deducting his average ordinary and necessary business expenses of $12,264.00 and $1,586.82 he pays into FICA, his average final income is $26,794.18 per year. The Defendant earns $50,000 per year. The parties are the same age but the Plaintiff suffers from high blood pressure and must be able to rest at time[s] to control the condition. The Defendant has retirement benefits and the Plaintiff does not. This is a twenty-one (21) year marriage. The youngest child is sixteen (16) years old and the Defendant works part time. The parties have a modest standard of living. The Plaintiff finished high school and the Defendant has four years of college. Plaintiff has a court-ordered child support obligation. Neither party testified regarding contributions made to the other's education, training, or earning ability. It will take time and money for the Plaintiff to acquire the education and training needed to obtain a higher paying job. The Court considers that a monetary spousal support award will be taxable to Plaintiff and deductible to the Defendant. The Court also considers that adding an additional tax or financial burden to either party is not in the children's best interest and would be inequitable.

{¶ 31} "After considering the applicable statutory factors, the Court finds a reasonable spousal support award to the Plaintiff [to] be necessary and will be in an amount equal to the child support amount calculated further herein and owed to Defendant by Plaintiff, or $7,600.09 per year. Therefore, an OFFSET of the child support owed by Plaintiff against the spousal support owed to the Plaintiff is appropriate. Therefore, there shall be no current payments of child support or spousal support payable by either party subject to the further orders of the Court. The Court retains jurisdiction over the amount of the spousal support award. Either party may file a motion in the future should the child support terminate or the obligation to pay child support terminates. The duration of the spousal support award is ten (10) years from June 1, 2006. The Court does not retain jurisdiction over the duration."

{¶ 32} On appeal, Linda contends that Jeffrey is capable of obtaining a job that pays better than his self-employment selling advertising for in-room guest directories in hotels. She also argues that he under-represented his income in the hearing before the trial court. These arguments fail to persuade us that the

trial court abused its discretion in awarding spousal support. Although Jeffrey worked at other jobs earlier in the marriage, he operated his own business, Creative Directories, for the last 12 years. The record contains evidence that the business, which Jeffrey operated full time, had been more successful prior to his loss of a key contract in 1999 and the subsequent September 11, 2001 attacks. Despite experiencing a downturn, Jeffrey continued to operate the business at the time of the parties' separation. His most recent tax return for 2004 reflected gross business income totaling $40,614. Although Jeffrey claimed to have virtually no net income, the trial court disallowed many of his business expenses and found that he had net business income of almost $27,000. Nothing in the record suggests that Jeffrey's business is a sham. Nor are we persuaded that the trial court abused its discretion in not requiring him to seek more lucrative work. We note that the trial court did not require Linda, who works only part-time, to pursue full-time employment.

{¶ 33} Linda also challenges the trial court's factual finding that Jeffrey "suffers from high blood pressure and must be able to rest at time[s] to control the condition." Relying on *Taylor v. Taylor*, Clark App. No. 2002 CA 72, 2003-Ohio-1029, 2003 WL 855757, she asserts that he presented no medical evidence to substantiate his claim. It is not clear to us how, if at all, the trial court's factual finding regarding Jeffrey's high-blood pressure factored into its spousal-support award. In any event, the trial court acted within its discretion in accepting Jeffrey's testimony about high blood pressure without corroborating medical evidence. In *Taylor*, the trial court held that the plaintiff had not presented sufficient medical evidence regarding injuries that prevented her from obtaining a higher-paying job. Upon review, we found no abuse of discretion. It does not follow, however, that a trial court always must require medical documentation when a party testifies about a medical condition.

{¶ 34} Although the trial court acted within its discretion in awarding Jeffrey spousal support, we find some merit in Linda's argument about the duration of the award. The record reflects that the parties married in 1983 and separated almost 22 years later.[2] We are unpersuaded by Linda's claim that a ten-year spousal support award is per se excessive for a marriage of 22 years. We are troubled, however, by the rationale for the trial court's ten-year award. In the divorce decree, the trial court appears to have based the length of the award, at least in part, on a finding that "[i]t will take time and money for [Jeffrey] to acquire the education and training needed to obtain a higher paying

---

2. In her reply brief, Linda asserts that the de facto termination date adopted by the trial court resulted in a marriage of only 19 years. This is not correct. The parties married in June 1983. The trial court used April 28, 2005, as the de facto termination date, resulting in a marriage of nearly 22 years.

job." But the record is devoid of evidence that Jeffrey desires, or will be taking steps to obtain, a better job. In fact, Jeffrey unequivocally testified that he has no intention of seeking any other employment, and the trial court did not order him to do so. Therefore, the trial court erred to the extent it based the duration of the spousal-support award on a need for Jeffrey to obtain additional education and training. Accordingly, we will remand the cause for the trial court to reconsider the duration of the spousal-support award or to provide additional justification for the ten-year duration.

{¶ 35} Finally, we reject Linda's argument that the trial court erred by not stating in the divorce decree that spousal support terminates upon Jeffrey's remarriage. Linda contends that "[t]his is the generally accepted rule in these matters and nothing in these facts exempts this case from the rule." In response, Jeffrey cites *Dunaway v. Dunaway* (1990), 53 Ohio St.3d 227, 560 N.E.2d 171, for the proposition that spousal support terminates by operation of law upon the recipient's remarriage. Therefore, he contends that including language to that effect in the divorce decree was unnecessary.

{¶ 36} Upon review, we conclude that neither party's position is entirely correct. Contrary to Linda's argument, a trial court does not necessarily err in failing to include language in a divorce decree terminating spousal support upon the recipient's remarriage. *Meeks v. Meeks*, Franklin App. No. 05AP–315, 2006-Ohio-642, 2006 WL 328685, ¶ 49. Instead, a trial court may retain jurisdiction to consider reducing or terminating spousal support upon the recipient's remarriage. Id. at ¶ 48–49. Contrary to Jeffrey's argument, we note too that spousal support no longer automatically terminates by operation of law when a recipient remarries. In *Dunaway*, the Ohio Supreme Court held, as a matter of public policy, that an ex-wife's remarriage automatically terminated her alimony award. Thereafter, in *Kimble v. Kimble*, 97 Ohio St.3d 424, 2002-Ohio-6667, 780 N.E.2d 273, the court abandoned this public-policy rationale in light of amendments to the Ohio Revised Code. Specifically, "the Ohio Supreme Court found that public policy principles in earlier precedent, dictating that a person should not be required to continue to pay spousal support to an ex-spouse who has remarried, conflicted with and had been superseded by amended R.C. 3105.18. The court concluded that, when a divorce decree does not provide for the termination of spousal support after the remarriage of a party, a trial court may terminate the support only when the decree contains an express reservation of jurisdiction. Thus, the court in *Kimble* made clear that a party's remarriage does not automatically terminate an award of spousal support." *Meeks*, supra, at ¶ 48; see also *Sutphin v. Sutphin*, Hamilton App. Nos. C–030747 and C–030773, 2004-Ohio-6844, 2004 WL 2913904, ¶ 30–35.

{¶ 37} In the present case, the trial court reserved jurisdiction over the amount of spousal support. Therefore, upon a proper motion and in the exercise of its discretion, the trial court presumably could reduce spousal support to zero if Jeffrey remarries. Because it retained jurisdiction, we cannot say that the trial court erred in failing to address the effect of remarriage on the spousal-support award in the divorce decree. Nevertheless, given that we are remanding the cause to the trial court for other reasons, it is also free to consider this issue and to add language addressing the effect of remarriage if it so desires. For the foregoing reasons, Linda's first assignment of error is sustained in part and overruled in part.

{¶ 38} In her second assignment of error, Linda claims that the trial court erred in not dividing a personal-injury settlement Jeffrey received during the marriage. This argument concerns the trial court's decision to give Jeffrey the first $48,500 in equity from the sale of the parties' Hastings Drive real estate. As set forth above, the trial court found Jeffrey entitled to this money because he had used $48,500 from a personal-injury settlement to pay down the mortgage.

{¶ 39} On appeal, Linda does not dispute that the personal-injury settlement Jeffrey received during the marriage was his separate property. See R.C. 3105.171(A)(6)(a)(vi). "Separate property is presumed to retain its separate nature as long as it is traceable, regardless of whether it has been commingled with other property. Thus, when one spouse contributes equity in the parties' marital home and that spouse can trace the equity to his or her pre-marital funds, those funds remain the spouse's separate property." *Jones v. Jones,* Athens App. No. 07CA25, 2008-Ohio-2476, 2008 WL 2152054, ¶ 21. "Holding property in co-ownership with a spouse is not determinative of whether property is separate or marital. Nonetheless, a spouse may convert separate property into marital property by making an inter vivos gift." Id. at ¶ 22. "[A]n inter vivos gift is an immediate, voluntary, gratuitous and irrevocable transfer of property by a competent donor to another." *Smith v. Shafer* (1993), 89 Ohio App.3d 181, 183, 623 N.E.2d 1261.

{¶ 40} In the present case, the trial court did not make any explicit findings about whether the personal-injury settlement Jeffrey used to pay down the marital mortgage retained its traceability or whether he intended to make an inter vivos gift to Linda by paying this marital debt. The trial court implicitly resolved these issues against Linda in the divorce decree, however, by awarding Jeffrey "the first $48,500 of equity to account for his separate non-marital property in the form of a settlement he received from a personal injury claim."

{¶ 41} On appeal, Linda addresses the issue of traceability and the issue of an inter vivos gift. She first asserts that Jeffrey's share of the personal-injury settlement lost its traceability when he placed it in a joint account and combined

it with other funds, including a loan from his father, to pay off the mortgage. Linda further asserts that the $48,500 became even less traceable when, after paying off the mortgage, the parties took out a new $50,000 home-equity loan on the property. She points out the impossibility of determining whose equity (Jeffrey's separate $48,500 or marital equity) effectively was withdrawn from the home when this new debt was incurred.

{¶ 42} Linda alternatively argues that the record supports a finding of an inter vivos gift. She stresses that Jeffrey placed his personal-injury settlement into a joint account and then used it to pay a marital debt. She also notes that Jeffrey used the money to pay the mortgage several years before the parties' separation. We additionally note Jeffrey's testimony that he and Linda discussed using the settlement to pay the mortgage before he did so. According to Jeffrey, they concluded that it would be best "for the future of our family" to pay the mortgage "and that's what we did."

{¶ 43} In the proceedings below, Jeffrey bore the burden of proving, by a preponderance of the evidence, that the first $48,500 in home equity was traceable to his separate personal-injury settlement. *Maloney v. Maloney,* 160 Ohio App.3d 209, 218, 2005-Ohio-1368, 826 N.E.2d 864. We believe he failed to do so, and the trial court's implicit finding to the contrary is against the manifest weight of the evidence. Id. at 218–219, 2005-Ohio-1368, 826 N.E.2d 864 (applying manifest-weight-of-the-evidence standard to trial court's findings regarding traceability); *Zeefe v. Zeefe* (1998), 125 Ohio App.3d 600, 614, 709 N.E.2d 208 ("A determination of traceability is a finding of fact. * * * A factual finding of the trial court will be reversed only if it is found to be against the manifest weight of the evidence").

{¶ 44} In reaching this conclusion, we are not persuaded that the personal-injury settlement lost its traceability when Jeffrey briefly placed the funds in a joint account. Nor are we persuaded by Linda's argument that traceability was lost when Jeffrey used the settlement proceeds and other funds to pay off the mortgage. Despite these acts, Linda admits that $48,500 of Jeffrey's separate property was applied to the marital debt. Therefore, the personal-injury settlement is traceable to the equity in the home when the parties paid off their mortgage. We are persuaded, however, that the settlement proceeds lost their traceability when the parties subsequently took out a $50,000 home-equity loan against the property. The record reflects that this loan remained almost entirely unpaid at the time of their divorce. Based on the record before us, it is impossible to determine whose equity (i.e., Jeffrey's separate $48,500 or other martial equity) was "cashed out" when the parties took the home-equity loan. Therefore, Jeffrey could not establish that the first $48,500 in home equity remaining at the time of the divorce represented the

proceeds from his personal-injury settlement. As Linda points out on appeal, the personal-injury settlement may have been "in effect disbursed from the Hastings house when the [parties] incurred the new debt." Because Jeffrey's settlement proceeds lost their traceability when the parties took out a home-equity loan, the trial court erred in treating the first $48,500 in equity as his separate property. Instead, the trial court should have treated all remaining equity in the home as marital property.[3] Linda's second assignment of error is sustained.

{¶ 45} In her third assignment of error, Linda contends that the trial court erred in not awarding her the tax exemption for both of the parties' minor children. She claims that the record does not support a finding that awarding Jeffrey one of the exemptions would be in the best interest of the children. In particular, she asserts that granting her both exemptions would produce a greater financial benefit than awarding one of the exemptions to Jeffrey, who would obtain little or no benefit from it.

{¶ 46} For his part, Jeffrey argues that the trial court retained jurisdiction to reconsider allocation of the tax exemptions if future circumstances warrant a modification. He also asserts that Linda is estopped from challenging the allocation of the tax exemptions because she agreed to leave the issue to the trial court's discretion. Jeffrey additionally claims that the trial court properly awarded him one of the exemptions after imputing income to him. Finally, he points out "that there was absolutely no testimony submitted at trial in regards to the tax benefits to either party in regards to the allocation of the exemptions and the trial court simply heard the testimony of the parties concerning their income and concluded that each party would be entitled to one exemption."

{¶ 47} Upon review, we find that the record does not enable us to determine whether the trial court abused its discretion in allocating the tax exemptions. As set forth above, the trial court granted Jeffrey, the nonresidential parent, one exemption and granted Linda, the residential parent, one exemption. The trial court further ordered that following emancipation of the oldest child, the parties are to alternate the remaining exemption each year.

{¶ 48} The allocation of tax exemptions for dependent children is governed by R.C. 3119.82, which provides:

{¶ 49} "Whenever a court issues * * * a court child support order, it shall designate which parent may claim the children who are the subject of the court child support order as dependents for federal income tax purposes * * *. If the parties agree on which parent should claim the children as dependents, the court

---

3. In light of this conclusion, we need not resolve Linda's alternative argument that Jeffrey's use of the personal-injury settlement to pay the mortgage constituted an inter vivos gift.

shall designate that parent as the parent who may claim the children. If the parties do not agree, the court, in its order, may permit the parent who is not the residential parent and legal custodian to claim the children as dependents for federal income tax purposes only if the court determines that this furthers the best interest of the children * * *. In cases in which the parties do not agree which parent may claim the children as dependents, the court shall consider, in making its determination, any net tax savings, the relative financial circumstances and needs of the parents and children, the amount of time the children spend with each parent, the eligibility of either or both parents for the federal earned income tax credit or other state or federal tax credit, and any other relevant factor concerning the best interest of the children."

{¶ 50} The foregoing statute recognizes a presumption that the custodial parent will receive the tax exemption for dependent children. It provides that a noncustodial parent may be awarded the exemption *only* upon a finding by the trial court that such an allocation furthers the best interest of the children. Therefore, the default position, absent this finding by the trial court, is that the custodial parent receives the tax exemption. See, e.g., *In re Custody of Harris*, 168 Ohio App.3d 1, 2006-Ohio-3649, 857 N.E.2d 1235, ¶ 56. The presumption that the custodial parent should receive the tax exemption comports with federal law. *Hughes v. Hughes* (1988), 35 Ohio St.3d 165, 167, 518 N.E.2d 1213.

{¶ 51} In the present case, the trial court did not expressly find that allowing Jeffrey to share the tax exemptions would be in the best interest of the children. The trial court simply allocated the exemptions in the divorce decree without any explanation. Likewise, at the conclusion of the two-day hearing, the trial court stated, without explanation, that the tax exemptions would be divided between the parties. When pressed on the issue by Linda's counsel, the trial court declared: "He's going—he's going to make the money that he's making to be able to pay this. He's going to claim them. He's going to get that benefit."[4] We might overlook the absence of a meaningful explanation from the trial court if it were apparent from the record that the allocation of the exemptions was in the

---

4. The trial court later added a caveat, advising Jeffrey: "[I]f you do your taxes next year and your tax guy says it won't save you a penny to have both exemptions, you let her have them. That's more money that's there for your kids to have and enjoy a better standard. You understand that?" This statement by the trial court does little to support its allocation of the tax exemptions. As an initial matter, the trial court never awarded Jeffrey "both exemptions." Moreover, when allocating tax exemptions, the issue is not whether granting the nonresidential parent an exemption would save that parent at least "a penny." The relevant inquiry is whether such an allocation would result in "any net tax savings." R.C. 3119.82. In other words, the question is whether the tax advantage to the noncustodial parent would be greater than the tax advantage enjoyed by the custodial parent. *Singer v. Dickinson* (1992), 63 Ohio St.3d 408, 415–416, 588 N.E.2d 806.

best interest of the parties' children. But we find little evidence in the record, and little guidance from the trial court, to support such a conclusion.

{¶ 52} Before granting Jeffrey a tax exemption, R.C. 3119.82 obligated the trial court to consider "any net tax savings, the relative financial circumstances and needs of the parents and children, the amount of time the children spend with each parent, the eligibility of either or both parents for the federal earned income tax credit or other state or federal tax credit, and any other relevant factor." In its ruling, the trial court did not refer to R.C. 3119.82. Nor did it address any net tax savings or the eligibility of either party for a federal earned income tax credit. Indeed, as Jeffrey candidly admits on appeal, "there was absolutely no testimony submitted at trial in regards to the tax benefits to either party in regards to the allocation of the exemptions." With regard to the other considerations, the record does contain some evidence about the financial circumstances of the parties. The trial court addressed these circumstances in the context of its spousal-support award, finding, among other things, that Jeffrey had annual self-employment income, minus business expenses and Social Security taxes, of $26,794.18. The trial court then found that Linda's annual salary was $50,000 per year. Finally, concerning the amount of time the children spend with each parent, the record reflects that Jeffrey has had unspecified difficulties with his children and that the trial court authorized visitation at the children's discretion.

{¶ 53} Based on the record before us, we simply cannot determine whether the trial court's decision to give Jeffrey a tax exemption is in the best interest of the parties' children. The trial court did not explain the basis for its decision, and the applicability of the R.C. 3119.82 factors is unclear. We confronted an identical situation in *Avery v. Avery* (Mar. 8, 2002), Greene App. No. 2001–CA–100, 2002 WL 360296, and found a remand necessary to allow the trial court to explain its basis for awarding the nonresidential parent a tax exemption. In our view, a remand is equally necessary here.

{¶ 54} Jeffrey's arguments do not persuade us otherwise. We do not dispute his observation that a trial court retains jurisdiction to alter its prior allocation of tax exemptions. See, e.g., *Drumm v. Drumm* (Mar. 26, 1999), Montgomery App. Nos. 16631 and 17115, 1999 WL 198120 ("Because the exemption is an incident of the child support order, the court has continuing jurisdiction to modify a prior assignment"). But this has nothing to do with whether the trial court's existing allocation of the tax exemptions is in the best interest of the children. We also find no merit in Jeffrey's claim that Linda is estopped from challenging the allocation because she agreed to leave the issue to the trial court's discretion. On the transcript page cited by Jeffrey, it was actually his attorney who expressed a desire to leave the issue to the trial court's discretion. In any event, the issue always is left to the discretion of the trial court. *In re Custody of*

*Harris,* 168 Ohio App.3d 1, 2006-Ohio-3649, 857 N.E.2d 1235, ¶ 55. A party's recognition of this fact does not estop the party from later arguing that the trial court abused its discretion. Finally, Jeffrey's observation "that there was absolutely no testimony submitted at trial in regards to the tax benefits to either party in regards to the allocation of the exemptions" actually works against him. As set forth above, the presumption is that the residential parent enjoys the benefit of the tax exemptions. Therefore, Jeffrey is the party who stands to lose if there is no testimony to support a finding that awarding him a tax exemption is in the children's best interest. Having reviewed the record, however, we believe the proper approach is to remand the cause to permit the trial court to explain the basis for its decision. Accordingly, we sustain Linda's third assignment of error.

{¶ 55} In her fourth assignment of error, Linda claims that the trial court "abused its discretion in setting a coverture factor on her federal retirement and in awarding [Jeffrey] survivor's benefits." Although portions of Linda's argument under this assignment of error are not entirely clear, we discern two general objections to the trial court's ruling. First, she contends the trial court awarded Jeffrey survivor benefits based on an incorrect assumption that she would not receive Social Security benefits. Second, she claims that the trial court erred in allowing Jeffrey to benefit from future increases in her pension's value due to her presumably higher salary in later years.

{¶ 56} Upon review, we find Linda's first argument to be without merit. In its ruling, the trial court stated: "Due to the nature of [Linda's] retirement benefits with FERS, she is not eligible to receive Social Security benefits." The trial court also found Jeffrey entitled to survivor benefits under Linda's FERS pension. Nowhere in its ruling, however, did the trial court indicate that it was awarding Jeffrey survivor benefits because Linda was not eligible to receive Social Security benefits. We see no connection in the trial court's ruling between Linda's purported ineligibility for Social Security benefits and Jeffrey's entitlement to FERS survivor benefits. Parenthetically, we note that a retirement-benefits analysis performed at the trial court's request by an organization known as Pension Evaluators indicates that Linda will receive some Social Security benefits. Even if this is true, however, the trial court's failure to take those benefits into account worked to her advantage. She cannot have been prejudiced by the fact that she has more retirement benefits available than the trial court realized.

{¶ 57} Linda's second argument is more problematic. She contends that the trial court erred in applying a "coverture factor" to allow Jeffrey to benefit from future increases in the value of her FERS pension from the federal government. Linda argues that the divorce decree should have granted Jeffrey just one-half of

the pension's value at the time of the parties' separation. Our problem with her argument is that the trial court appears to have done what she wanted.

{¶ 58} During the hearing, Linda expressed concern about Jeffrey's benefitting from any post-divorce rise in salary that might increase her pension. The trial court responded: "Anything that happens after [the separation date] is to your benefit. So one-half of the retirement earned up to April something." Language in the divorce decree also indicates that the trial court did not intend for Jeffrey to benefit from any post-divorce increase in the value of Linda's pension. The divorce decree provides:

{¶ 59} "Plaintiff shall be entitled to fifty [percent] (50%) of the marital portion of Defendant's retirement benefits held with FERS after an offset against said marital portion for fifty percent (50%) of the marital portion of Plaintiff's Social Security benefits as detailed pursuant to the *Neville* valuation previously filed herein. Present value calculations concerning Plaintiff's Social Security benefits and Defendant's CSRS [sic] benefits have been prepared by Pension Evaluators who shall utilize same in preparing an order for submission to FERS to effectively divide Defendant's retirement benefits. Plaintiff shall also be named survivor on his portion of Defendant's FERS benefits after the aforementioned offset to take into account Defendant's marital interest in Plaintiff's Social Security benefits."

{¶ 60} The trial court's reliance upon the *Neville* valuation and its use of present-value calculations are particularly noteworthy.[5] In the *Neville* analysis, representatives of Pension Evaluators found that if Linda, who was 44 years old, were to quit working immediately, she would be eligible to begin drawing an FERS pension of $12,420 per year at age 60. Pension Evaluators reduced this future stream of income to a present value of $84,310.53. It then found that the marital portion of the present value, subject to division between the parties, was $79,465.37. In the divorce decree, the trial court instructed Pension Evaluators to use its present-value figures in "preparing an order for submission to FERS to effectively divide [Linda's] retirement benefits." These present-value figures would be irrelevant if the trial court intended to grant Jeffrey a proportionate share of an unknown future value of the pension based on a coverture fraction formula.[6]

---

5. The trial court's reference to *Neville* is a reference to *Neville v. Neville,* 99 Ohio St.3d 275, 2003-Ohio-3624, 791 N.E.2d 434, wherein the Ohio Supreme Court held that a trial court may take into consideration the parties' future Social Security benefits.

6. " 'The coverture fraction takes the total years of marriage divided by the total years of [the former spouse's] service. Under this method, [the recipient spouse] receives half of the coverture fraction multiplied by the value of the pension' at the time of retirement." *Benfield v. Benfield* (Nov. 7, 2003), Montgomery App. No. 19363, 2003 WL 22533132, quoting *Cox v.*

{¶ 61} Therefore, we can conclude only that the trial court did not grant Jeffrey a right to share in future increases in the value of Linda's pension. Instead, the trial court reduced the FERS pension to present value based solely on the years Linda already has worked. It then awarded Jeffrey one-half of the marital portion of the present value, $79,465.37 minus an offset to account for his future Social Security benefits,[7] but deferred distribution of the money until Linda retires. We need not address the wisdom of such a division or whether it is equitable to Jeffrey, because he has not appealed from the trial court's ruling. Because the trial court gave Linda what she wanted, her fourth assignment of error is overruled.

{¶ 62} Based on the reasoning set forth above, we affirm in part and reverse in part the judgment of the Greene County Common Pleas Court, Domestic Relations Division. The cause is remanded for further proceedings consistent with this opinion.

Judgment affirmed in part
and reversed in part,
and cause remanded.

FAIN and DONOVAN, JJ., concur.

---

*Cox* (Feb. 1, 1999), Warren App. Nos. CA98–04–045 and CA98–05–054, 1999 WL 58098. "The result of this method of computation is that the recipient [spouse] obtains a proportionate share of any post-divorce increase in the value of her former [spouse's] pension." Id.

7. In its analysis, Pension Evaluators also reduced Jeffrey's future Social Security benefits to their present value.